UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| BRECK ENGLAND<br><br>                Plaintiff,<br><br>vs.<br><br>JOEL HATCH et al.,<br><br>                Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br>Case No.: 1:14-cv-079-CW<br><br>Judge Clark Waddoups |

## <u>INTRODUCTION</u>

Prior to November 1950, members of the State Board of Education ("Board") were appointed rather than elected. In 1950, however, voters elected to amend the Utah Constitution to require that Board members be elected. The State then implemented a non-partisan procedure whereby candidates were selected through a convention to determine which names should appear on a separate ballot at the general election. Later, the Utah legislature amended the election procedure to provide that a Committee selected by the Governor will interview and vet applicants for the Board. The Committee then advances three or more names per district for the Governor's review, and the Governor chooses two names per school board district for the general election ballot. The criteria used for selection are completely discretionary. Plaintiffs contend the statute is facially unconstitutional because it abridges their free speech in violation of the *First* and *Fourteenth Amendment*. The court agrees and hereby declares certain provisions of the statute are facially unconstitutional.

## BACKGROUND

Article 10, Section 3 of the Utah Constitution states "[t]he general control and supervision of the public education system shall be vested in a State Board of Education.  The membership of the board shall be established and elected as provided by statute."  The initial procedure for electing Board members was substantially different than the one that exists today.  *See State Bd. of Educ. v. Comm'n of Fin.*, 247 P.2d 435, 438, 445 (Utah 1952) (explaining the initial election procedure).

Section 20A-14-104 of the Utah Code now provides for the establishment of a twelve-member nominating and recruiting committee (the "Committee") that is appointed by the Governor. The Committee reviews applications for Board membership and selects which candidates it will interview for each school board district.  Of those interviewed, the Committee selects at least three names per district[1] and advances those names to the Governor.  Utah Code § 20A-14-104(5)(c).  The criteria used for selection are discretionary and may include any "other life experiences" the Committee concludes "would benefit the State Board of Education."  *Id.* § 20A-14-104(6).  The State acknowledges that the selection criteria are not neutral.  The Governor then selects, from the names advanced, two individuals per district and those names are placed on the ballot for the general election.  *Id.* § 20A-14-105.  The statute provides no criteria for the Governor to use when selecting the final two individuals for the ballot.  *See id.*

Plaintiff Breck England has a Ph.D and many years of experience in business and education. The Committee interviewed Mr. England, but did not advance his name to the Governor.  Plaintiff Pat Rusk has a bachelor's degree in Elementary Education, has taught school for many years, and

---

[1]  The district elections are staggered so the Committee selects names only for those districts subject to election in that year.

has received numerous awards and recognitions for her efforts in education.  The Committee advanced her name to the Governor, but ultimately, she was not selected for the ballot.  It is also undisputed, that some incumbents, who previously were deemed qualified and elected, were later rejected by the Committee when they have re-applied to continue their Board position.

<u>**ANALYSIS**</u>

**I.      Presumption and Burden of Proof**

The Plaintiffs challenge the constitutionality of Sections 20A-14-104 and -105 of the Utah Code.  The court begins with the presumption that the statute is constitutional.  Additionally, the court "will presume any narrowing construction or practice to which the law is fairly susceptible." *City of Lakewood v. Plain Dealer Publ'g Co*., 486 U.S. 750, 769 (1988) (quotations and citation omitted).

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."  *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1452 (2014) (quotations and citation omitted).  The State contends its Board selection process does not even touch on speech because there is no *First Amendment* right to have your name appear on the ballot, and the Committee and Governor's roles are merely to act as gatekeepers for ballot access. Because their roles are to license access to the ballot as opposed to licensing speech, the State contends the statute does not restrict speech and the State has no burden to establish its constitutionality.  The court disagrees.

In *City of Lakewood*, a city ordinance required a person to obtain a license before it could place a newsrack on city property.  Under the ordinance, the mayor had the discretion to grant or deny the application based on any term or condition he deemed appropriate.  While placement alone

of a newsrack does not involve a speaker, the Supreme Court nevertheless concluded the ordinance imposed a burden on expressive activity. *City of Lakewood*, 486 U.S. at 756 57. In particular, the licensing procedure applied "to conduct commonly associated with speech." *Id.* at 759. And while the mayor did not actually view the speech that would be spoken by the applicant, he could "measure their probable content or viewpoint by speech already uttered." *Id.* Under such circumstances, an applicant "is under no illusion regarding the effect of the 'licensed' speech on the ability to continue speaking in the future," and therefore, the applicant may modify his or her speech to obtain a license. *Id.* at 759 60. This chilling effect constitutes a restriction on speech. In this case, the Committee poses as even greater threat on speech because it "view[s] the actual content of the speech" that will be spoken by the candidates. *Id.* at 760 (citation omitted). The court thus concludes the State's statute does implicate and restrict speech. Accordingly, the State bears the burden of proving its Board selection process is constitutional.

## II.    Basic Rights

"[L]aws that burden political speech are subject to careful judicial review." *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013). This is so because "[t]here is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon*, 134 S. Ct. at 1440 41.

The Supreme Court has stated "the *First Amendment* has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Id.* at 1441 (quotations and citation omitted). "Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them

on election day." *Brown v. Hartlage*, 456 U.S. 45, 53 (1982). "The *First Amendment* is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us." *McCutcheon*, 134 S. Ct. at 1448 (quotations and citation omitted).

## IV.    State's Rights and "Fit"

States, however, "have a legitimate interest in preserving the integrity of their electoral processes." *Brown*, 456 U.S. at 51. The Supreme Court has "recognized that the State's interest in keeping its ballots within manageable, understandable limits is of the highest order." *Lubin v. Panish*, 415 U.S. 709, 715 (1974) (citation omitted). This includes "regulating the number of candidates on the ballot." *Bullock v. Carter*, 405 U.S. 134, 145 (1972) (citations omitted). Moreover, the Constitution provides that States have the power to regulate the time, place, and *manner* of their own elections. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citing Art. I, § 4, cl. 1). Invariably, this power will "impose some burden upon [candidates] and individual voters." *Id.* Thus, every election law is not subject to strict scrutiny. *Id.*

"But when a State seeks to uphold that interest by restricting speech, the limitations on state authority imposed by the *First Amendment* are manifestly implicated." *Brown*, 456 U.S. at 51  52. It is the court's role to "weigh the character and magnitude of the asserted injury . . . against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick*, 504 U.S. at 434 (quotations and citation omitted). In so doing, the court should take "into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* (quotations and citation omitted).

Here, the State contends it has an interest in ensuring an orderly ballot process. It received

-5-

seventy applications for the Board positions this year, and placing all seventy names on the general ballot would be cumbersome and engender possible voter confusion. Additionally, the statute seeks to select "candidates who possess outstanding professional qualifications relating to the powers and duties of the State Board of Education." Utah Code § 20A-14-104(6). The court must weigh these interests against the *First Amendment* injury claimed by Plaintiffs. Moreover, it must consider whether the particular burden created by the statute is necessary or appropriate to further the State's interests.

When analyzing this "fit," if "a state election law provision imposes only reasonable nondiscriminatory restrictions upon the *First* and *Fourteenth Amendment* rights of voters,[2] the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (quotations and citation omitted). In contrast, if "rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id.* (quotations and citation omitted).

Here, the State acknowledges that its selection process is *not* neutral. The Committee and Governor may use any criteria to accept or reject an applicant. If an applicant is rejected, the applicant's name does not appear on the ballot for the voters' consideration.[3] This burden is substantial, not simply because ballot access has been denied, but because the applicant's viewpoints

---

[2] Although this is a ballot access case, the Supreme Court has "minimized the extent to which voting rights cases are distinguishable from ballot access cases, stating that 'the rights of voters and the rights of candidates do not lend themselves to neat separation.'" *Burdick*, 504 U.S. at 438 (quoting *Bullock*, 405 U.S. at 143). The court therefore applies the same standard here to evaluate whether the statute imposes only reasonable, non-discriminatory restrictions.

[3] The statute does provide for a write-in process. As the court will discuss below, however, the write-in process does not provide a meaningful alternative for a candidate's name to appear on the ballot.

were evaluated as part of the criteria for placement on the ballot and judged to be inappropriate or insufficient under the State's selection process. Hence, the State must do more to justify its restrictions.

In truth, "[w]hen a State seeks to restrict directly the offer of ideas by a candidate to the voters, the *First Amendment* surely requires that the restriction be demonstrably supported by not only a legitimate state interest, but a compelling one, and that the restriction operate without unnecessarily circumscribing protected expression." *Brown*, 456 U.S. at 53  54. For the Government may not "favor some participant in that process over others." *McCutcheon*, 134 S. Ct. at 1461. Based on the nature of the statute at issue and its effects, the court concludes the State must offer a compelling reason to justify the severe restrictions it places on potential candidates.

With respect to the State's interest of choosing highly qualified candidates for the Board, any fear the State may have "that voters might make an ill-advised choice does not provide the State with a compelling justification for limiting speech. It is simply not the function of government to select which issues are worth discussing or debating." *Brown*, 456 U.S. at 60 (quotations and citation omitted). That interest, therefore, fails to justify the burdens imposed by the State's statute. As for ensuring an orderly ballot process and reducing voter confusion, the heavy burden imposed by the statute does not "fit" those interests. This is especially so when the State previously had a neutral selection process and later chose to modify it with this non-neutral procedure.

Even if the State were not required to offer a compelling reason for its interests, however, the means it employs to preserve its stated interests must still be "narrowly tailored to achieve the desired objective." *McCutcheon*, 134 S. Ct. at 1457 (quotations and citations omitted). As discussed below, the State has failed to meet this burden as well.

V.      **Prior Restraint and Unbridled Discretion**

"A scheme of prior restraint gives 'public officials the power to deny use of a forum in advance of actual expression.'" *Am. Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1250 (10th Cir. 2000) (quoting *Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)).  While not unconstitutional *per se*, "any system of prior restraint comes to the Court bearing a heavy presumption against its constitutional validity." *Id.* (quotations, citations, and alteration omitted). Moreover, "no system of prior restraint may place unbridled discretion in the hands of a government official or agency." *Id.* (quotations and citation omitted).

In a licensing context, the Supreme Court has stated "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, *even if the discretion and power are never actually abused*." *City of Lakewood*, 486 U.S. at 757 (emphasis added).  Thus, "[i]t is not merely the sporadic abuse of power by the censor *but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion*." *Id.* (quotations and citation omitted) (emphasis in original).

"[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and view point censorship.  This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *Id.* at 763.  Only by imposing standards that limit this discretion may the danger be avoided.  Absent such standards, "*post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy." *Id.* at 758.

As stated above, the State contends the statute at issue here only acts as a gatekeeper to have a name on the ballot, which is not speech.  It contends the case is therefore different from *City of*

*Lakewood* because there the mayor was actually prohibiting speech by refusing to issue a permit to sell newspapers. The court disagrees with this contention, for what was at issue in the *City of Lakewood* was permission to place a newspaper stand on public property. The mayor did not review and analyze the exact speech to be spoken. He simply stated, as allowed by ordinance, that a newspaper stand could not be placed on public property. Yet, the Supreme Court found the ordinance violated free speech because it implicated viewpoints that had previously been spoken and potentially would be chilled in the future. Just as *City of Lakewood* addressed placement of a newspaper stand on public property, so does the Utah statute address placement of a name on a ballot, and in a similar manner implicates free speech. More troubling here, however, is that the State *does* review what will be spoken before it concludes which names may be placed on the ballot.

The court finds the role of the Committee and the Governor is similar to that of a licensor, for they authorize or certify whether a person may participate as a candidate, not based on some neutral criteria, but "upon the content of the speech or viewpoint of the speaker." *City of Lakewood*, 486 U.S. at 763 (citation omitted). The threat here is most severe because the Committee "view[s] the actual content of the speech to be licensed or permitted" during the application and interview process. *Id.* at 760 (citation omitted). The fact that the Committee has rejected otherwise qualified candidates and refused to re-certify incumbents shows that the Committee and Governor are using something other than neutral criteria during the selection process.

Moreover, the statute has a "catch all" provision that allows the Committee to select a person based on any "life experiences that would benefit the State Board of Education." As in *American Target Advertising, Inc.*, this further supports the unbridled discretion of the Committee and Governor because the provision is limitless. *See Am. Target Adver., Inc.*, 199 F.3d at 1252.

Accordingly, the court concludes the unfettered discretion the Committee and Governor have during the selection process constitutes a prior restraint that has a chilling effect on the candidates' speech.  Such a process neither provides a compelling reason for abridging free speech, nor does it provide a narrowly tailored means of meeting the State's interest of having an orderly ballot.  The court must now determine whether the statute is facially unconstitutional.

**VI.    Facial Challenge**

"To find a provision facially unconstitutional, [the court] must conclude that any attempt to enforce such legislation would create an unacceptable risk of the suppression of ideas."  *Am. Target Adver., Inc. v. Giani*, 199 F.3d at 1246  47 (quotations and citation omitted).  Although the State has a legitimate interest in regulating the number of candidates on the ballot to ensure it is orderly, it "cannot achieve its objectives by totally arbitrary means; the criterion for differing treatment must bear some relevance to the object of the legislation."  *Bullock*, 405 U.S. at 145 (citations omitted). That is lacking here.

Indeed, based on how the statute is written and how it has been applied, it appears to be "a mechanism" by which "certain classes of candidates [are excluded] from the electoral process." *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983) (quotations and citations omitted).  As stated before, even those previously selected by the electorate, have later been rejected by the Committee based on their arbitrary view of which candidates may best serve the populace.

The court therefore concludes that any attempt to apply the statute to the selection of candidates for the ballot "would create an unacceptable risk of the suppression of ideas."  *Am. Target Adver., Inc. v. Giani*, 199 F.3d at 1247 (quotations and citation omitted).  It vests the Committee and the Governor with authority to decide which "individuals are entitled to exercise *First Amendment*

-10-

rights" before the electorate. *Id.* at 1253 (quotations and citation omitted). The court further concludes the statute is not susceptible to a limiting construction.

Additionally, the court concludes the State has failed to provide any meaningful alternative. In *Lubin*, the Supreme Court stated "that ballot access must be genuinely open to all, subject to reasonable requirements." *Lubin*, 415 U.S. at 719 (citation omitted). Even though the State has chosen who will speak through the formal election process, it contends it nevertheless has afforded all individuals the right to speak due to its "write-in" provisions. Due to the write-in process, a person may campaign for office, not via any formal process, but on the person's own, and ask the populace to write his or her name on the ballot. The State contends this shows it has not abridged speech in any fashion because a person still has every opportunity to be elected to the Board.

The State ignores the effect of its selection process whereby certain candidates have their names formally listed on the ballot with the imprimatur of the Committee and Governor, while other candidates must ask voters to write their names in after they have already been rejected by the State. The court concludes simply affording a candidate an alternative means through a write-in process "falls far short" of the access afforded to those who names are on the ballot, and does not cure the unconstitutional abridgement of free speech. *See id.* at 719 n.5. The burden on candidates is simply too great to overcome the initial denial of their *First Amendment* rights.

Here, the statute essentially is a standardless one because there is no measuring stick by which to determine why one candidate is selected over another. As a result, Utah's ballot for these positions is not genuinely open to all under reasonable requirements. For these reasons, the court concludes that Section 20A-14-104(5)(b) through (6)(k) of the Utah Code is facially unconstitutional. The court further concludes that Section 20A-14-105 is also facially unconstitutional.

## **CONCLUSION**

For the reasons stated above, the court concludes that Section 20A-14-104(5)(b) through (6)(k) and Section 20A-14-105 of the Utah Code are facially unconstitutional.  The court stays this ruling until the parties have had the opportunity to brief the appropriate remedy that should apply in this case.  Additionally, the court requests that the parties brief whether these provisions are severable from the remaining statute.  The parties shall submit this briefing on or before Tuesday, September 9, 2014.  The court has set a further hearing on these issues for September 11, 2014 at 10:00 a.m.

DATED this 6th day of September, 2014.

BY THE COURT:

Clark Waddoups
United States District Court